HALL, Judge.
This is an action by a mother for damages arising out of the death of her five year old son who was beaten to death by a foster mother with whom the child had been placed by the Louisiana Department of Public Welfare. Named defendants were the foster mother, Ethel Bradford, her husband, Willie Bradford, and the State of Louisiana, through the Department of Public Welfare. The district court rendered judgment in favor of plaintiff, Gracie M. Tensley Vonner, against Ethel Bradford for $4,500. Plaintiff’s demands against Willie Bradford and the Department were rejected. Plaintiff appealed, seeking a reversal of the adverse judgments in favor of Willie Bradford and the Department and seeking an increase in the award. We affirm the judgment of the district court.
Plaintiff is the mother of nine children, most of whom have been removed from her care on one or more occasions by court order. In June, 1968, the court placed several of the children in the custody of the Louisiana Department of Public Welfare. The Department placed 'three of the boys, Michael, Christopher and Johnny, in the home of Willie and Ethel Bradford and shortly thereafter, one of the girls, Pamela, was removed from another foster home and also placed with the Bradfords.
On January 14, 1970, Johnny Lealto Von-ner died at the Bradford home as a result of numerous injuries sustained at a time when only Ethel Bradford was present. She was indicted, tried and found guilty of manslaughter. The criminal conviction was pending on appeal during the trial of the case before us now. That conviction has since been affirmed. See: State v. Bradford, 259 La. 381, 250 So.2d 375 (1971).
There are three issues presented by this appeal:
(1) Was the Department guilty of negligence which was the proximate cause of the death of Johnny Lealto Von-ner?
(2) Is Willie Bradford liable as head and master of the community for the acts of his wife which caused the death ?
(3) Is the award inadequate?
The cause of death was an issue at the trial below. Although apparently not an issue on appeal, we feel it is necessary to discuss the trial judge’s findings on this point because the manner in which the death occurred permeates all the issues on this appeal.
Mrs. Bradford testified the child was playing in a room which was being renovated and fell, presumably hitting his head *95 on a toy truck. She denied striking him, and contended that she stopped the bleeding and that he appeared to be “all right” until very shortly before her husband arrived from work, even talking and sharing a cold drink with the other children when they came from school. She stated Johnny appeared to “get sleepy” late in the afternoon and became unconscious, but she had no way to get assistance imtil her husband came home. He thought the child was dead when he arrived and called the sheriff’s office.
The coroner testified that he was summoned to the Bradford home and found the floor in the front room freshly scrubbed, clean clothes on the child’s body and the other clothes freshly washed. He observed cuts on the child’s head, pronounced it dead and arranged for removal of the body to a funeral home, where he performed an autopsy. He reported: a one and one-half inch cut on the left side of the scalp; two half inch cuts on the scalp in the right occipital area; bruises and lacerations in the left mastoid area and around the left eyelid; many healed lacerations on the scalp; swelling and discoloration of the right orbit; evidence of an old hematoma in the right temporal area estimated to be five to seven days old; substantial extra-dural hemorrhage in the right occipital area under the previously mentioned cuts; subdural hemorrhage under the cut in the left parietal area; substantial swelling of the brain; blood “in all cavities of the brain”; contusions, bruises and scratches over the front and side of the neck; tranverse brush burns of the chest; large amounts of fresh blood in the left side of the pleural cavity, with fractures of the second and third ribs on the left; contusions or brush burns on the abdomen, arms, back, thighs, and lower legs. He expressed the opinion that death resulted primarily from the internal hemorrhages in the brain and chest. He stated that the multiple injuries, most of which were recent, could not have resulted from a fall. He made a particular point of his observation that all marks or external evidence of trauma were horizontal or “crossways” on the head, body and extremities.
From this evidence the trial judge correctly found that “ . . .in the light of human experience and common knowledge, it is wholly unrealistic to conclude that the multiple physical injuries found by the coroner in his post-mortem could have been caused by a single fall such as that postulated by Mrs. Bradford. It is abundantly clear that the deceased child, shortly before his death received several severe blows to the head, chest and extremities, which must have been separately inflicted. According to all the evidence, no one but Mrs. Bradford was present who could have been responsible. The Court therefore concludes that Mrs. Bradford did strike the child with some object and did inflict injuries which caused or directly contributed to his death.”
There are other background facts pertinent to consideration of the issues raised on appeal. The Bradfords had served as foster parents in the Department’s foster care program for some time, without any problems. They had a good record with the Department and their reputation in their community was good. To all outward appearances, the children living with them were well cared for.
Pamela and Michael had run away from the Bradford home on three occasions. At the time of the runaways, their ages were eleven and thirteen respectively. On these occasions they told the welfare worker they ran away because Mrs. Bradford whipped or beat them. The welfare personnel observed the children and saw no evidence of physical abuse. They talked to Mrs. Bradford who denied abusing the children and gave other reasonable reasons for the children running away. Their running away was not inconsistent with their previous behavior and background. Pamela and Michael were no longer living with the Bradfords at the time of Johnny’s death, having been removed from that home after the last time they ran away.
*96 Although the guidelines and policies of the Department were that each foster home be visited by a worker at least once each two months and that the children receive a medical examination at least once a year, the Bradford home had not been visited for approximately three months prior to the date of Johnny’s death. The children had not received a medical examination since being placed with the Bradfords — a period of about a year and a half.
The morning after the tragedy the representatives of the Department took Christopher Vonner, who was still living in the Bradford home, to a pediatrician, Dr. Elaine Fichter, who took X-rays and examined the child completely. Dr. Fichter found the following: a bruise behind the ear, an old abrasion over the rib cage and a tender, welt-like swelling over the right arm and shoulder. As to the history which she obtained, Dr. Fichter testified, “Each time I asked him how it happened, it was his mother hit him with something.” The X-rays were sent to Dr. O. H. Vreeland, a radiologist, who found a healed fracture of a right rib and an old injury to the right humerus.
Concerning the three issues presented by this appeal, the trial judge wrote an exhaustive opinion. We quote with approval those portions of his reasons for judgment as follows:
“LIABILITY OF THE DEPARTMENT
“Joint Exhibit No. 1 filed in evidence is a publication by the Department issued to its employees which contains instructions as to selection of foster homes and supervision by Department workers of children temporarily in their custody and in foster care. Among the provisions of this document are the ‘rules’ that: the Department ‘assumes virtually all the responsibilities of a parent’; visitation by the worker of the foster home should occur at least once each month for the first six months and once each two months thereafter; medical examinations of the children should be obtained at time of placement and at least once each twelve months thereafter (for children over one year of age).
“Plaintiff contends that these ‘regulations’ were enacted by the Department pursuant to the mandate of R.S. 46:52 and were therefore expressive of the legal duties resting upon the Department in regard to the Vonner children. It is urged that there was confusion of responsibility among workers, failure to visit as required, no medical examinations at all of any of the children from the date of their placement to the date of Johnny’s death, complete unconcern about Pamela’s and Michael’s reports of beatings, official oblivion to plaintiff’s own complaints and pleas for investigation, blind acceptance of any and all reports and comments by Mrs. Bradford, and other evidence of abandonment of responsibility by the Department workers. Thus, plaintiff argues, the Department was negligent; and since compliance with its own ‘regulations’ and/or reasonable supervision and investigation would have revealed Mrs. Bradford was in fact beating the children and would have resulted in their removal from that home, the negligence is a proximate cause of the death.
“In reviewing the cited statute and the documents filed in evidence, the Court has serious doubt that these ‘rules’ were ever intended to have the force of law in regard to child care. It seems more likely as the Department contends, that these are ‘guidelines’ or ‘goals’ toward which its employees are directed and which its administrative or management personnel use in training and guiding employees. It is, however, unnecessary to decide the issue in this case, since plaintiff may not recover even if it be assumed that the Department’s employees were negligent in failing to comply with these regulations or otherwise. The evidence on the issue of proximate cause falls far short of the legal standard.
“Plaintiff’s theory is necessarily premised upon the conclusion that Mrs. Brad *97 ford regularly and frequently beat the children. From this premise, it is then concluded that if the Department’s employees had believed [Mrs. Vonner] and her older children and if they had visited regularly and if they had required medical examination within twelve months of placement, these beatings would have been discovered and verified. Further, from these conclusions, plaintiff then finally concludes that such discoveries would have resulted in Johnny’s removal from the home and Mrs. Bradford could not have caused his death. To reach this ultimate fact and thus find a causal relationship requires too much speculation and too many assumptions.
“It has been demonstrated that plaintiff and her two older children are not reliable; and there was certainly no specific obligation on the part of the Department’s employees to take unusual action in response to unreliable information from untrustworthy persons on the occasions of the ‘runaways’. Much of the foundation for plaintiff’s structure is therefore considerably weakened.
“Moreover, there is no real basis in fact for the assumption that medical examinations and worker visits conducted in compliance with the Department’s ‘regulations’ would necessarily have brought about discovery of vicious propensities on the part of Mrs. Bradford. With respect to Pamela and Michael, there is only their word without independent corroboration. With respect to the deceased child, there is actually no probative evidence to indicate that he was beaten except shortly prior to the fatal occurrence. As to Christopher, there were actually two injuries which might have been inflicted by Mrs. Bradford (or someone else) but the evidence as to when these injuries occurred is most speculative. In fact, both doctors interrogated on this subject admitted their opinions were almost purely guesses; and the estimates ran from several weeks to a year or more prior to the examination. Hence, on this evidence, it can readily be seen that at any regular medical examination or any regular visit without medical examination the injuries may or may not have been sustained or visible. Further, if they were discovered, there is no way to know what investigation at that time may have revealed as to their cause.
“While this record certainly reflects discredit upon the Department’s personnel in their lack of diligence and supervision over the foster home and the Vonner children, the evidence falls short of the standard of proof required to establish a causal relationship between the omissions and the death of the child. Plaintiff’s reliance upon the clearly distinguishable case of Mogabgab v. New Orleans Parish School Board, 239 So.2d 456 is misplaced. There, a young athlete suffered heat stroke, was unconscious on the field and was not afforded prompt medical attention by those who were present and witnessing his condition. In such circumstances, although recognizing the lack of medical certainty on the issue of causation, the Court could and did draw upon common experience, was impressed by the apparent lack of concern on the part of those present, and found for plaintiff on the basis of evidentiary probabilities. Here, the evidentiary facts relied upon are at best speculative and the conclusions drawn by plaintiff are more assumptions than probabilities.
“LIABILITY OF THE COMMUNITY
“In the precise context presented here, this is apparently a novel issue, since no appellate cases in point have been cited, nor has the Court found any. Defendant contends that any act on the part of Mrs. Bradford giving rise to liability was intentional, deliberate and criminal; that she was not acting as agent of the community, nor did she have any express or implied permission of her husband to commit such act; that since he was not present and there is no evidence that any interest of the community was being served, the husband *98 cannot be vicariously liable.[1] Plaintiff, on the other hand, contends that • when the Bradfords applied for and were granted foster home status, this was a community undertaking; that they stood ‘in loco par-entis’ with respect to the foster children, equally obligated to provide lodging, food, guidance and proper discipline; that when Mr. Bradford was at work, such duties were delegated to his wife; that when she inflicted the fatal injuries upon Johnny, she was exercising these community functions and the community is therefore vicariously liable with her, even though in anger or intentionally she grossly exceeded the bounds of reasonableness.[2]
“While in abstract theory one might agree with plaintiff that the maintenance of the foster home was a ‘joint enterprise’ or community endeavor of the Bradfords, it cannot be said that there is any credible evidence that Mr. Bradford in any manner sanctioned, expressly or impliedly, the one deliberate beating which caused or contributed to Johnny’s death, or that Mrs. Bradford was serving any community function when she inflicted it. Again, plaintiff is basing her contentions upon the assumption that Mrs. Bradford repeatedly and frequently beat the children and adding the inference that her husband knew or should have known of such beatings. As has been demonstrated, the evidence simply does not support these assumptions; nor does it depict an admitted ‘institutional’ policy of severe whippings such as that found to exist in the Lewis case relied upon by the plaintiff.
“Again, it is pointed out that the evidence here convinces only that the fatal beating occurred. That there may have been one or two other injuries from blows at some time within a year or more is insufficient to establish personal involvement or actual constructive knowledge on the part of Mr. Bradford that his wife was beating the children. There is no evidentiary basis for liability on his part, either personally or as head and master of the community.
“QUANTUM
“Plaintiff in brief admits that the evidence indicates she was ‘not an ideal mother’. Reviewing the jurisprudence, she therefore reduces the awards made in more recent cases and suggests $7,000.00 damages for the loss of her son. Pointing to Mrs. Bradford’s testimony which indicated that the accident occurred about 3:30 p. m. and death sometime before her husband arrived about 6:00 p. m., plaintiff contends Johnny suffered excruciating pain for a period of one to three hours and, again referring to ‘similar’ cases, suggests $5,-000.00 for these damages. The Department cites other cases and contends the suggested awards are ‘too high.’ Mr. and Mrs. Bradford contend that the child must be considered to have died instantly and suggest only nominal damages for plaintiff. All defendants point to the substantial body of evidence of an almost indescribably poor performance of motherhood by plaintiff.
“Without recitation of details, it is sufficient to state that this record reveals a continuing pattern of utter irresponsibility *99 on the part of plaintiff toward all her children, as well as herself. They lived in complete squalor; they were not only not encouraged to attend school but were actually kept out by her to do housework or perform other work or errands for plaintiff; they were repeatedly left without care or supervision while she pursued personal pleasures; they had few clothes and little food and no training whatever. This was true despite a not wholly inadequate income from social security and veteran’s benefits derived through a former husband; and it is obvious that whatever superficial efforts plaintiff made to ‘recover’ the children legally taken from her were motivated by her desire to re-acquire this income more than by any appreciable feeling of desire for the children. Her whole adult life has been one of complete self-interest and total irresponsibility.
“ ‘Love and affection’ and the feelings and losses compensated in death actions are nebulous and subjective. When any relationships resembling normalcy are being evaluated, certain degrees of these emotions, feelings and intangible characteristics can be and are assumed to exist by the courts even though some actions may appear inconsistent with their existence, allowances being made for the ‘ambiguity’ of mankind. In reality, however, their existence, or the degree thereof, can only be measured by actions and other outward or visible manifestations; and when this record is carefully considered, no objective person could believe that this plaintiff could have felt any real ‘love and affection’ for Johnny or any lasting emotion caused by his death. There are no reported ‘similar’ cases; and the Court feels that $3,000.00 would adequately, if not liberally, compensate plaintiff.
“As to damages suffered by Johnny prior to his death, the evidence is scant and confusing. Mrs. Bradford’s testimony implies that he lived some two hours, that he bled considerably and that he was crying when she discovered him. The coroner’s testimony implies that he believed the child died quickly, if not instantly. The head and chest injuries described would no doubt have been extremely painful if he remained conscious, but as described, they were certainly consistent with instant unconsciousness or death. Further, Mrs. Bradford stated that by the time she had Johnny cleaned up, he had stopped crying, seemed ‘all right’, talked and enjoyed a drink with the other children and then simply became drowsy. If believed, these facts would appear to be inconsistent with substantial suffering after the first short period following injury. Obviously, some award is indicated, but it cannot be assumed from this evidence that there was the degree and duration of suffering contended for by the plaintiff. Punitive damages may not be allowed, the facts are speculative. The sum of $1,500.00 will adequately compensate plaintiff with respect to this claim of damage.”
For the reasons assigned, the judgment of the district court is affirmed.
Affirmed.

. Citing among other authorities, Civil Code Articles 2315; 2317-2322; 2985-2986; Adams v. Golson [187 La. 363], [174] [176] So. [876]; Martin v. Brown, 240 La. 674, 124 So.2d 904; Brantley v. Clarkson, 217 La. 425, [45] [46] So.2d 614; Vail v. Spampinato, 238 La. 259, 115 So.2d 343; Bradford v. Brown [La.App.], 199 So.2d 414; Galle v. Ingraham, [La.App.], 140 So.2d 741.

. Plaintiff analogizes with eases in which an employee exceeds authority or exercises authority in an extreme manner but is still held to be acting in the course and scope of employment, thus rendering his employer vicariously liable for torts or even intentionally inflicted damage. She relies principally upon Lewis v. State [La.App], 176 So.2d 718, wherein the state was held liable for the deliberate acts of guards at a juvenile institution whose beatings caused or contributed to the death of an inmate.